**Carolyn HUMPHREY, Plaintiff–
Appellant,**

v.

**MEMORIAL HOSPITALS
ASSOCIATION, Defendant–Appellee.**

No. 98–15404.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 10, 1999.

Submission vacated Dec. 8, 1999.

Resubmitted Feb. 7, 2001.

Filed Feb. 13, 2001.

---

22. 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

23. *See Farhad,* 190 F.3d at 1101–1109 (9th Cir.1999) (Reinhardt, J., concurring specially).

Jerry Budin, Green & Azevedo, Modesto, California, for the plaintiff-appellant.

John Edward Fischer, James Francis Curran, and Rhonda Canby of Diepenbrock, Wulff, Plant, and Hannegan LLP, Sacramento, California, for the defendant-appellee.

Before: KRAVITCH,[1] REINHARDT, and T.G. NELSON, Circuit Judges.

REINHARDT, Circuit Judge:

Carolyn Humphrey brought suit against her former employer, Memorial Hospitals Association (MHA), under the Americans with Disabilities Act (ADA) and its California counterpart, the Fair Employment and Housing Act (FEHA) for failure to reasonably accommodate her disability and wrongful termination. We reverse the district court's grant of summary judgment in favor of MHA.

## I. BACKGROUND

Humphrey worked for MHA as a medical transcriptionist from 1986 until her termination in 1995. At the time of her termination, she was earning approximately $11.00 per hour. Throughout her employment at MHA, Humphrey's transcription performance was excellent and consistently exceeded MHA's standards for speed, accuracy, and productivity.

In 1989, Humphrey began to experience problems getting to work on time, or at all. She engaged in a series of obsessive rituals that hindered her ability to arrive at work on time. She felt compelled to rinse her hair for up to an hour, and if, after brushing her hair, it didn't "feel right," she would return to the shower to wash it again. This process of washing and preparing her hair could take up to three hours. She would also feel compelled to dress very slowly, to repeatedly check and recheck for papers she needed, and to pull out strands of her hair and examine them closely because she felt as though something was crawling on her scalp. She testified that these obsessive thoughts and rituals made it very difficult to get to work

on time. Once she realized that she was late, she would panic and become embarrassed, making it even more difficult for her to leave her house and get to work.

Due to Humphrey's difficulties with tardiness and absenteeism, MHA gave her a "Level I" disciplinary warning in June 1994. This warning required her to call her supervisor before the time she was due to be at work if she was going to be late or absent. Humphrey's mental obsessions and peculiar rituals only grew worse after the warning, and her attendance record did not improve; nor did her call-in rate. In December 1994, she received a "Level III" warning, which documented four tardy days and one unreported absence over a two week period.

When MHA gave Humphrey the Level III warning, she was told that she was expected to schedule and keep counseling appointments with the Employee Assistance Program (EAP). This counseling consisted of "tips," helpful hints such as getting up earlier and laying out clothes the night before. Humphrey found this somewhat helpful and attended several sessions, but her efforts to follow the "tips" were not particularly successful. After watching an episode of the Oprah Winfrey show devoted to attention deficit disorder, Humphrey began to suspect that her debilitating symptoms and inability to get to work on time might be related to a medical condition. In May, 1995, she asked MHA's EAP nurse, Elizabeth Pierson, if she could see a psychiatrist for an evaluation. Pierson agreed, and set up an appointment for a diagnostic evaluation and psychological testing with Dr. John Jacisin. MHA paid for the consultation through its EAP program.

Humphrey first saw Dr. Jacisin on May 12, 1995. Dr. Jacisin diagnosed her with obsessive compulsive disorder (OCD).[2] He

---

1. The Honorable Phyllis A. Kravitch, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

2. Individuals with obsessive compulsive disorder experience obsessions or compulsions or both. See American Psychiatric Ass'n, Di-

agnostic and Statistical Manual of Mental Disorders 417 (4th ed.1994). Obsessions are recurring or persistent thoughts, images, or impulses that, rather than being voluntarily produced, seem to invade a person's consciousness despite his attempts to ignore,

sent a letter explaining that diagnosis to Pierson on May 18, 1995, telling her that Humphrey's OCD "is directly contributing to her problems with lateness." In addition, the letter stated:

I believe that we can treat this, although, the treatment may take a while. I do believe that she would qualify under the Americans with Disability Act, although, I would like to see her continue to work, but if it is proving to be a major personnel problem, she may have to take some time off until we can get the symptoms better under control.

Humphrey sought treatment from Dr. Jacisin and from a psychologist, Dr. Litynsky. Dr. Litynsky, like Dr. Jacisin, diagnosed Humphrey with OCD and concluded that it was probable that the OCD caused her absenteeism and tardiness. Humphrey had difficulty paying for the necessary services, however, because her insurance did not cover the treatment. In addition, due to the severe symptoms of her ailment, Humphrey had great difficulty showing up for appointments. Both doctors considered her inconsistency in treatment in 1995 and 1996 to be the result of the disorder as well as her financial problems.[3]

On June 7, 1995, Humphrey met with Pierson and Humphrey's supervisor, Carol Evans–Bowlsby, to review Dr. Jacisin's letter. What happened at this meeting is disputed. MHA contends that Humphrey rejected the leave of absence alluded to in the doctor's letter. Humphrey says that she was never offered a leave of absence and never rejected one. Instead, she testified that "they asked if I would like to keep working. And I said yes." She did not remember anyone using the term "leave of absence." (As it turns out, this factual dispute is not material to our ruling on appeal.)

Humphrey did want to try to keep working, if possible, and Pierson told her that she could have an "accommodation" that would allow her to do so. Pierson suggested, as an accommodation, that Humphrey have a friend or family member drive her to work every day. Humphrey said that this suggestion would not be feasible. Pierson next offered a flexible start-time arrangement in which Humphrey could begin work any time within a 24 hour period on days on which she was scheduled to work. Pierson asked her to think about whether this would help her and whether any other accommodation would be desirable, and asked her to submit any additional requests for accommodation in writing. A few days later, Humphrey sent Pierson a letter accepting the flexible start time arrangement, and saying that she "would still do my best to be at my work station at the earliest possible hour."

Nevertheless, Humphrey continued to miss work. It is disputed whether Humphrey's supervisor warned her about her conduct during the remainder of that summer. It is undisputed, however, that no one from MHA broached the subject of modifying the accommodation during that period. On September 18, 1995, Humphrey, upset about her continuing problems, sent Pierson an e-mail message asking for a new accommodation because the then-current one seemed to be failing:

Dear Liz:

It has now been a few months since I sent you a memo regarding how my disability would best be accommodated as far as my job performance. I have since come to the conclusion that I would be able to put in considerable

suppress, or control them. *See id.* at 418. Compulsions are urges or impulses to commit repetitive acts that are apparently meaningless, stereotyped, or ritualistic. *See id.* The disorder was recently made famous by Jack Nicholson's Oscar-winning portrayal of a man with OCD in the 1998 film *As Good As it Gets.*

**3.** Dr. Litynsky testified, "[h]er obsessive compulsive disorder was certainly the primary factor in her inability to appear for most of her missed sessions with me. If the same set of events were occurring while she was employed, I would believe that it was very likely a major factor in her nonappearance at work."

more hours [sic] and be much more productive if I were able to work from my home as a lot of other transcriptionists are doing. . . . I think this would be the ideal way to accommodate my diagnosed disability.

MHA allows certain medical transcriptionists to work out of their homes. Dr. Jacisin was not asked by anyone at MHA for his opinion on the work-at-home request. After Humphrey's termination, Jacisin said that working at home "might accommodate some of her work issues" but might be "anti-therapeutic." He testified, in his deposition in this lawsuit, that he felt working at home was an accommodation which would have been worth trying because it was necessary for Humphrey to earn money and increase her self-confidence.

In any event, Humphrey's request was summarily denied. In an e-mail message, Pierson denied her request for work-at-home accommodation on the ground of Humphrey's disciplinary warnings for tardiness and absenteeism. Pierson did not suggest an alternative accommodation or indicate that MHA would be receptive to reassessing its arrangements to accommodate Humphrey in light of the apparent failure of the flexible work schedule arrangement. Instead, she wrote:

It is departmental policy that if you are involved in any disciplinary action you are ineligible to be a home based transcriptionist as per the AT HOME ARRANGEMENT FOR TRANSCRIPTIONISTS. Since you are currently involved in the discipline process, you are ineligible for being based at home. During our 6/7/95 meeting, you requested to be accommodated for your disability by having a flexible start time, stating that you would have no problems staying for a full shift once you arrived. You were given this flexible start time accommodation which continues to re-

main in effect. As for your productivity, your manager indicated that you consistently meet your hourly productivity requirements when you are at work.

Pierson's comment regarding Humphrey's productivity at work was typical of Humphrey's performance evaluations, which recognized her high level of competence but were tarnished by the problems caused by her disability. For example, in her annual performance review completed on September 26, 1995—approximately two weeks before she was terminated—Humphrey exceeded expectations in minutes typed per shift and in errors per 130 lines checked. She was one of the only transcriptionists who could accurately transcribe the comments of a particular group of physicians. Her review noted that this was "a very difficult task as the majority of physicians speak with very pronounced accents. You have done this very well as you have learned the accents and have become familiar with the styles." She was regarded as very cordial, considerate, honest, and tactful.

Humphrey's evaluation indicates that were it not for her ailment, she would have been a model employee. The only negative ratings she received were in relation to the problems caused by the interference of her symptoms and the accommodation of flexible start time.[4] Her evaluation stated that her recent unscheduled absences were "unacceptable," and advised that correcting her attendance problem was "a major goal for the upcoming year." During a meeting with her supervisor, Julie Vieira, to discuss her evaluation, Humphrey again raised the issue of working at home, but was told that she would have to be free of attendance problems for a year before she could be considered for an at-home transcriptionist position. Neither

4. For example, she was criticized because she was "not able to learn and transcribe Pathology because of your inconsistent work hours. You are scheduled to start work at 10:00 a.m. but do not come to work before 4:00 p.m. which is after the deadline FOR Pathology." However, at this time Humphrey had been given permission to arrive at work after 4:00 p.m. in accordance with the flexible start-time accommodation.

Humphrey nor her supervisor suggested a medical leave of absence at this meeting.

Humphrey was absent two more times, and on October 10, 1995, Vieira fired her. MHA's stated reason for the termination was Humphrey's history of tardiness and absenteeism. Humphrey testified that after learning of her termination, she went across the hall to Pierson's office and asked if she might take a leave of absence instead of lose her job, but that Pierson refused and told her that she had had her chance at accommodation. Pierson denies that Humphrey requested a leave of absence on the day of her discharge. MHA concedes that it would have granted the request if Humphrey had asked for a leave of absence prior to her termination, as MHA had a policy of permitting medical leaves of absence to employees with disabilities.

On September 6, 1996, Humphrey brought suit against MHA for violation of the ADA and the FEHA.[5] The district court granted MHA's motion for summary judgment on the theory that MHA had satisfied its duty to reasonably accommodate Humphrey's disability. The district court found it "dispositive ... that Plaintiff was initially offered a leave of absence and rejected it, and then failed to request a leave of absence subsequently." Humphrey appeals the judgment entered in favor of MHA.

## II. DISCUSSION

Humphrey contends that MHA violated the ADA and the FEHA by failing to reasonably accommodate her disability and by terminating her because of that disability. The ADA[6] provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability...." 42 U.S.C. § 12112(a). Title I of the ADA insures full opportunities for people with disabilities in the workplace by requiring reasonable accommodation of employees' disabilities by their employers. Under the ADA, the term "discriminate" is defined as including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). To prevail on a claim of unlawful discharge under the ADA, the plaintiff must establish that he is a qualified individual with a disability and that the employer terminated him because of his disability. *Cooper v. Neiman Marcus Group*, 125 F.3d 786, 790 (1997). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."[7] 42 U.S.C. § 12102(2)(a).

■ In ADA cases, as in all appeals, we review a grant of summary judgment de novo. *McAlindin v. County of San Diego*,

5. Humphrey also brought claims for violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601–2654, and the California Family Rights Act, Cal. Govt.Code § 12945.2. However, Humphrey does not appeal the adverse judgment on those claims.

6. Because the FEHA provisions relating to disability discrimination are based on the ADA, decisions interpreting federal anti-discrimination laws are relevant in interpreting the FEHA's similar provisions. *See Brundage v. Hahn*, 57 Cal.App.4th 228, 235, 66 Cal.

Rptr.2d 830 (Cal.Ct.App.1997). We analyze Humphrey's state and federal disability claims together, relying on federal authority in the absence of contrary or differing state law. *See id.*

7. The statute's definition also includes "having a record of such an impairment," 42 U.S.C. § 12102(2)(B), or "being regarded as having such an impairment," 42 U.S.C. § 12102(2)(C). Humphrey argues only that she has an actual impairment under § 12102(2)(A).

192 F.3d 1226, 1232 (9th Cir.), *amended* 201 F.3d 1211, and *cert. denied,* — U.S. ——, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000).

## A. QUALIFIED INDIVIDUAL WITH A DISABILITY

Because the district court granted summary judgment to MHA on the ground that it reasonably accommodated Humphrey, the court did not address whether Humphrey is a qualified individual with a disability. However, MHA asks us to uphold the judgment on the alternate ground that Humphrey is not disabled and that she is not a "qualified individual" for purposes of the ADA. Because we reject MHA's reasonable accommodation argument, we consider its alternate ground here.

Most of the issues relating to Humphrey's status as a qualified individual with a disability are legal. The primary factual dispute arises out of an equivocal report and declaration by defense expert Dr. Weissman. The report raises some question regarding the testimony of Drs. Jacisin and Litynsky that Humphrey suffered from OCD and that her condition caused her attendance problems. Dr. Weissman declares that although Humphrey may have suffered from OCD with psychotic features while employed by MHA, it is also possible that she was suffering from brief psychotic delusional episodes rather than OCD. He continues in his report: "It is a mistake to assume that the only explanation for her tardiness (or of anyone's) was obsessive compulsive disorder. There are lots of other problems that can result in chronic tardiness. And alternate sources of stress were operating in 1994 in Ms. Humphrey's life." If, as Dr. Weissman

suggests, Humphrey's difficulties getting to work may not have stemmed from OCD but may have been attributable to other "problems," it is possible that Humphrey might not be a qualified individual with a disability under the ADA. Because Humphrey does not seek summary judgment, we need not determine whether the conclusory and somewhat ambiguous statements of Dr. Weissman are sufficient to create a triable issue of fact as to whether she is a qualified individual with a disability (OCD or otherwise). Rather, for purposes of this appeal, we will assume without deciding that MHA has presented sufficient evidence to survive summary judgment on this point.

MHA also argues that Humphrey is not disabled for purposes of the ADA because she is not substantially limited in one or more of her major life activities. The EEOC regulations provide that "caring for oneself" is a major life activity. 29 C.F.R. § 1630.2(i). According to the EEOC, "[a]n impairment substantially limits an individual's ability to care for him/herself if, due to the impairment, an individual is significantly restricted as compared to the average person in the general population in performing basic activities such as getting up in the morning, bathing, dressing, and preparing and obtaining food." EEOC Enforcement Guidance: Psychiatric Disabilities and the ADA, FEP (BNA) 405:7461, at 7467 (March 25, 1997) [hereinafter EEOC Enforcement Guidance on Psychiatric Disabilities].[8]

The facts are undisputed with regard to Humphrey's ability to care for herself.[9] The testimony of Humphrey and Dr. Jacisin, her mental health provider, reflects that it took Humphrey significantly more time than the average person to accom-

---

**8.** By contrast, the legislative definition of a "mental disability" in the FEHA does not require that the disability substantially limit a major life activity, but merely that it "limit" a major life activity. *See* Cal. Govt.Code § 12926(1). Because a triable issue of fact exists as to whether Humphrey is disabled under the ADA, a fortiori an issue of fact also exists as to whether she is disabled under the FEHA.

**9.** We need not address whether Humphrey is substantially limited in working. *See McAlindin,* 192 F.3d at 1233; EEOC Enforcement Guidance on Psychiatric Disabilities, at 7463 ("The first question is whether an individual is substantially limited in a major life activity other than working (e.g. sleeping, concentrating, caring for oneself). Working should be analyzed only if no other major life activity is substantially limited by an impairment.").

plish the basic tasks of washing and dressing. According to Humphrey, the process of washing and brushing her hair alone could take several hours, and she at times would prepare for work from eight o'clock in the morning until five or six o'clock in the evening. Dr. Jacisin testified that, on one OCD screening test, she was rated as taking three times as long as most people to shower, wash her hands, dress, and handle or cook food. MHA argues that even if Humphrey's ritualistic behaviors caused her to take more time to complete basic activities than the average person, she is not disabled under the ADA because her OCD did not prevent her from accomplishing those activities. As the Supreme Court has noted, however, "[t]he [Americans with Disabilities] Act addresses substantial limitations on major life activities, not utter inabilities." *Bragdon v. Abbott,* 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). An impairment "substantially limits" one's ability to carry out a major life activity if, because of the impairment, the individual is "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). An individual who has a physical or mental impairment that causes him to take inordinately more time than others to complete a major life activity is substantially limited as to that activity under the ADA. There is no dispute on the record before us that Humphrey falls within that category. Accordingly, in determining whether Humphrey is disabled for purposes of the ADA, the question is not whether she is substantially limited in her ability to care for herself, but whether she had OCD, and, if so, whether her OCD was the cause of her limitation.

MHA next argues that Humphrey was not "qualified" for the medical transcriptionist position within the meaning of the ADA. A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). It is undisputed that Humphrey had the skills, training, and experience to transcribe medical records. MHA contends that Humphrey's inability to show up for work and to notify her employer when she would be absent renders her not otherwise qualified under the ADA [10] because regular and predictable attendance is an essential function of the position.[11] However, Humphrey is a "qualified individual" under the ADA so long as she is able to perform the essential functions of her job "with or without reasonable accommodation." 42 U.S.C. § 12111(8). Either of two potential reasonable accommodations might have made it possible for Humphrey to perform the essential functions of her job: granting her a leave of absence or allowing her to become a "home-based transcriptionist."

A leave of absence for medical treatment may be a reasonable accommodation under the ADA. *See* 29 C.F.R. 1630 app. § 1630.2(o). We have held that where a leave of absence would reasonably accommodate an employee's disability and permit him, upon his return, to perform the

---

10. MHA also argues that Humphrey's inability to perform her job duties extended beyond her attendance difficulties. However, the only negative comments on her evaluations are related to attendance. For example, she was unable to learn and transcribe pathology because she was unable to arrive at work consistently before the pathology department's four o'clock deadline. Her poor scores for attendance and attendance-related activities and policies resulted in a "below average" overall rating.

11. Humphrey concedes that regular and predictable job performance is an essential function of the MHA medical transcriptionist position. We note that although excessive or unscheduled absences may prevent an employee from performing the essential functions of his job and thereby render him not otherwise qualified for purposes of the ADA, regular and predictable attendance is not per se an essential function of all jobs.

essential functions of the job, that employee is otherwise qualified under the ADA. *See Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir.1999).

MHA contends that Humphrey is not otherwise qualified because the results of the leave of absence were speculative. However, the ADA does not require an employee to show that a leave of absence is certain or even likely to be successful to prove that it is a reasonable accommodation. In *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir.), *cert. denied*, 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990), we held that a leave of absence was a reasonable accommodation for an employee whose cluster migraine headaches, a condition for which there was no specific treatment program, caused him sporadically to miss work.[12] We noted that

> [w]hile it is altogether possible that Kimbro's migraine episodes may have recurred upon his return to work following a leave of absence, such a possibility does not foreclose a finding of liability for failure to accommodate Kimbro's migraines.... As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation.

*Id.* at 879. The statements in Dr. Jacisin's letter that Humphrey's condition was treatable and that "she may have to take some time off until we can get the symptoms better under control" are sufficient to satisfy the minimal requirement that a leave of absence could plausibly have enabled Humphrey adequately to perform her job.[13] We discuss in Section C below MHA's contention that it was not required to offer Humphrey a leave of absence or other accommodation unless she specifically requested it.[14]

There is another reasonable accommodation that could also serve to render Humphrey a "qualified individual." There is at least a triable issue of fact as to whether Humphrey would have been able to perform the essential duties of her job with the accommodation of a work-at-home position. Working at home is a reasonable accommodation when the essential functions of the position can be performed at home and a work-at-home arrangement would not cause undue hardship for the employer. EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, FEP (BNA) 405:7601, at 7626 (March 1, 1999) [hereinafter EEOC Enforcement Guidance on Reasonable Accommodation].[15] Humphrey does not dispute

**12.** *Kimbro* involved the Washington state handicap laws, which are similar to the ADA and the FEHA. *See Schmidt v. Safeway, Inc.*, 864 F.Supp. 991, 996 (D.Or.1994); *Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 949 n. 3, 62 Cal.Rptr.2d 142 (Cal.Ct.App. 1997); *see also Sanders v. Arneson Prod. Inc.*, 91 F.3d 1351, 1354 (9th Cir.), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997) (relying on *Kimbro* when construing the ADA).

**13.** Of course, the requirement to grant a leave where there are plausible reasons to believe that it would accommodate the employee's disability can not be repeatedly invoked, thus permitting an unqualified employee to avoid termination by requesting a leave of absence each time he is about to be fired. As we noted in *Kimbro*, the fact that a prior leave was granted and was unsuccessful may be a relevant consideration in determining whether additional leave would be a reasonable

accommodation. *Kimbro*, 889 F.2d at 879 n. 10.

**14.** We also note that an employer need not make an accommodation, including granting a leave of absence, if it poses an undue hardship. 42 U.S.C. § 12112(b)(5)(A). However, MHA makes no such contention here.

**15.** Courts have taken differing approaches toward working at home as an accommodation. *Compare Vande Zande v. Wisconsin Dept. of Admin.*, 44 F.3d 538, 544–45 (7th Cir.1995) (holding that an employer is not required to allow disabled workers to work at home except in extraordinary circumstances), *with Langon v. Department of Health and Human Servs.*, 959 F.2d 1053, 1060–61 (D.C.Cir.1992) (holding that an employer must consider requested accommodation of working at home), *cited with approval in Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir.1993). We

that regular and predictable performance of the job is an essential part of the transcriptionist position because many of the medical records must be transcribed within twenty-four hours, and frequent and unscheduled absences would prevent the department from meeting its deadlines. However, physical attendance at the MHA offices is not an essential job duty; in fact, the record makes it clear that MHA permits some of its medical transcriptionists to work at home.

MHA denied Humphrey's application for a work-at-home position because of her disciplinary record, which consisted of Level I and Level III warnings for tardiness and absenteeism prior to her diagnosis of OCD. It would be inconsistent with the purposes of the ADA to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated. Thus, Humphrey's disciplinary record does not constitute an appropriate basis for denying her a work-at-home accommodation.

Although Dr. Jacisin was less optimistic about Humphrey's working at home than he was about a leave of absence, Humphrey has submitted sufficient evidence to raise an issue of fact as to whether she could perform the job with the accommodation of a work-at-home position. She testified that her ailment interfered primarily with her ability to leave her house in the morning. Dr. Jacisin stated that working at home "might accommodate some of her work issues," and later testified that he felt working at home would have been worth trying because "her OCD really didn't interfere necessarily with her ability to do the work, that is to actually do the typing and transcription." A reasonable jury could conclude that if Humphrey was relieved of the stress of having to leave the house, she could perform her transcriptionist duties and thus was "qualified" under the ADA.

see no reason not to follow the approach taken by the EEOC in its Enforcement Guid-

Accordingly, we hold that MHA is not entitled to summary judgment on the issue of whether Humphrey is a "qualified individual with a disability" for purposes of the ADA.

## B. BREAKDOWN OF THE INTER-ACTIVE PROCESS

The remaining question with respect to the duty to accommodate is a purely a legal one: was MHA obligated to suggest a leave of absence or to explore other alternatives in response to Humphrey's request for a work-at-home position, or was it Humphrey's burden to make an express request for a leave of absence before she was terminated? We conclude, as a matter of law, that (assuming Humphrey was a qualified individual with a disability) MHA had an affirmative duty under the ADA to explore further methods of accommodation before terminating Humphrey.

Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. *Barnett v. U.S. Air,* 228 F.3d 1105, 1114 (9th Cir.2000). "An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position." *Id.* at 1115. The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process. *Id.* at 1114–15; *Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."). Employers, who fail to engage in the interactive process in good faith, face liability for the remedies

ance.

imposed by the statute if a reasonable accommodation would have been possible. *Barnett*, 228 F.3d at 1116.

Moreover, we have held that the duty to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.'" *McAlindin*, 192 F.3d at 1237. The EEOC Enforcement Guidance notes that "an employer must consider each request for reasonable accommodation," and that "[i]f a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." EEOC Enforcement Guidance on Reasonable Accommodation, at 7625. Thus, the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work, and by avoiding the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective.

When MHA received Dr. Jacisin's letter diagnosing Humphrey with OCD, MHA properly initiated the interactive process by arranging a meeting to discuss possible accommodations. Dr. Jacisin's statement "I would like to see her continue to work, but if it is proving to be a major personnel problem, she may have to take some time off until we can get the symptoms better

under control" alerted MHA to the possibility that any initial arrangement that kept Humphrey on the job might not be effective and that a leave of absence might ultimately be necessary to accommodate her disability. In fact, it is MHA's position, disputed by Humphrey, that MHA explicitly offered her a leave at the June 7 meeting, and that it was Humphrey who decided that flexible scheduling was the better choice. Even if we assume that Humphrey turned down the leave of absence in June in favor of a flexible start-time arrangement, her attempt to perform her job functions by means of a less drastic accommodation does not forfeit her right to a more substantial one upon the failure of the initial effort.

■ By the time of her annual performance review in September, it was abundantly clear to MHA that the flexible start time accommodation was not succeeding; Humphrey had accumulated six unreported absences in each of the months of August and September, and her evaluation stated that her attendance record was "unacceptable." At this point, MHA had a duty to explore further arrangements to reasonably accommodate Humphrey's disability.

Humphrey also realized that the accommodation was not working, and requested a work at home position. When it received that request, MHA could have either granted it or initiated discussions with Humphrey regarding other alternatives.[16] Instead, MHA denied her request without suggesting any alternative solutions, or exploring with her the possibility of other accommodations. Rather than fulfill its obligation to engage in a cooperative dialogue with Humphrey, Pierson's e-mail suggested that the matter was closed: "During our 6/7/95 meeting, you requested

---

16. As we have discussed, working at home is a reasonable accommodation when the essential functions of the position can be performed at home and a work-at-home arrangement would not cause an undue hardship for the employer. EEOC Enforcement Guidance on Reasonable Accommodation, at 7626. Al-

though MHA may have violated the ADA by refusing her request for a work at home accommodation, we do not reach this issue because on appeal Humphrey argues only the failure to grant a leave of absence as a violation of the duty to accommodate.

to be accommodated for your disability by having a flexible start time, stating that you would have no problems staying for a full shift once you arrived. You were given this flexible start time accommodation which continues to remain in effect." We held in *Barnett* that an employer fails to engage in the interactive process as a matter of law where it rejects the employee's proposed accommodations by letter and offers no practical alternatives. *See Barnett*, 228 F.3d at 1116–17. Similarly, MHA's rejection of Humphrey's work-at-home request and its failure to explore with Humphrey the possibility of other accommodations, once it was aware that the initial arrangement was not effective, constitutes a violation of its duty regarding the mandatory interactive process.

Given MHA's failure to engage in the interactive process, liability is appropriate if a reasonable accommodation without undue hardship to the employer would otherwise have been possible. *See id.* at 1117. As we have already discussed, a leave of absence was a reasonable accommodation for Humphrey's disability.[17] Ordinarily, whether an accommodation would pose an undue hardship on the employer is a factual question. Here, however, MHA has conceded that granting a leave of absence would not have posed an undue hardship. MHA had a policy of granting leaves to

disabled employees, and admits that it would have given Humphrey a leave had she asked for one at any time before her termination. MHA's ultimate position, therefore, is simply that Humphrey is not entitled to a leave of absence because she failed to ask for one before she was fired. As we have explained, however, MHA was under a continuing duty to offer a reasonable accommodation. Accordingly, we hold as a matter of law (again, assuming that Humphrey is a qualified individual with a disability) that MHA violated the ADA's reasonable accommodation requirement.

## C. REASON FOR TERMINATION

■■■ Unlike a simple failure to accommodate claim, an unlawful discharge claim requires a showing that the employer terminated the employee because of his disability. *See Cooper v. Neiman Marcus Group*, 125 F.3d 786, 790 (1997). Often the two claims, are, from a practical standpoint, the same. For the consequence of the failure to accommodate is, as here, frequently an unlawful termination. In this case, MHA's stated reason for Humphrey's termination was absenteeism and tardiness. For purposes of the ADA, with a few exceptions,[18] conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for

---

17. *See* Section IIA *supra.*

18. The text of the ADA authorizes discharges for misconduct or inadequate performance that may be caused by a "disability" in only one category of cases-alcoholism and illegal drug use: "[An employer] may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee." 42 U.S.C. § 12114(c)(4). In line with this provision, we have applied a distinction between disability-caused conduct and disability itself as a cause for termination only in cases involving illegal drug use or alcoholism. *See Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir.1996) (holding that an employer may fire an employee who went on a "drunken ram-

page" and attempted to fire an assault rifle at individuals in a bar); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 (9th Cir.), *cert. denied*, 516 U.S. 1048, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996) (employees discharged for drug-related misconduct at the workplace); *see also Hartog*, 129 F.3d at 1085–88 (reviewing cases in all circuits and finding that "the disability vs. disability-caused conduct dichotomy seems to be unique to alcoholism and drugs."). In *Newland*, however, we suggested that an additional exception might apply in the case of "egregious and criminal conduct" regardless of whether the disability is alcohol- or drug-related. *See Newland*, 81 F.3d at 906 ("Attempting to fire a weapon at individuals is the kind of egregious and criminal conduct which employees are responsible for regardless of any disability."). Any such exception would not be applicable to Humphrey's absences or tardiness.

termination. *See Hartog v. Wasatch Academy,* 129 F.3d 1076, 1086 (10th Cir. 1997). The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability. *See Borkowski v. Valley Central Sch. Dist.,* 63 F.3d 131, 143 (2d Cir.1995). In *Kimbro,* for example, we found that there was a sufficient causal connection between the employee's disability and termination where the employee was discharged for excessive absenteeism caused by migraine-related absences. *See Kimbro,* 889 F.2d at 875. Similarly, Humphrey has presented sufficient evidence to create a triable issue of fact as to whether her attendance problems were caused by OCD. In sum, a jury could reasonably find the requisite causal link between a disability of OCD and Humphrey's absenteeism and conclude that MHA fired Humphrey because of her disability.

## III. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to MHA on Humphrey's ADA and FEHA claims is hereby REVERSED and the case is REMANDED for proceedings consistent with this opinion.