Filed 3/19/25  Tuens v. U.S. Bank National Association CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TRACY TUENS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>U.S. BANK NATIONAL ASSOCIATION et al.,<br><br>    Defendants and Respondents. | A169335<br><br>(San Francisco County Super. Ct. No. CGC-20-583302) |

Tracy Tuens appeals from a judgment entered in favor of her employer defendants U.S. Bank National Association and U.S. Bankcorp, and her supervisor, defendant Martim L. De Arantes Oliveira (collectively the Bank) on her complaint for disability discrimination and other violations of the California Fair Employment and Housing Act (Gov. Code,[1] § 12900 et seq.) (FEHA).  We find no error and affirm the judgment.

### BACKGROUND

In May 2016, Tuens was hired as a "Senior Wealth Strategist/Director" by the Ascent division of U.S. Bank.  Ascent

---

[1] All undesignated statutory references are to the Government Code.

serves individuals and families of significant wealth and has selective requirements for prospective clients, including that they have a net worth of at least $75 million and generate a minimum of $200,000 in annual fee revenue. Tuens' employment history reflects her significant experience in new client acquisition, and her primary responsibility at the Bank was similarly to secure new clients for the division.

In October 2015, prior to her hire, Tuens submitted a proposed business plan to the Bank showing that she planned to secure, from her current contacts, three new clients within the first six months of employment, and an additional three clients during the next six months, for a total of six clients in the first year. According to the plan, her "pipeline" showed four possible new clients, and she estimated $300,000 net revenue in the first six months, with about $600,000 to $650,000 of revenue in the first year.

In December 2016, Tuens suffered from a catastrophic illness that required her to take a medical leave of absence. Tuens returned to work with no restrictions on March 27, 2017.

On June 21, 2017, Tuens' supervisor sent her an email recapping a conversation they had the day before regarding her performance. The email suggested that her objectives for the remainder of the year might be to average two to three prospect meetings per month and close one piece of business by September. The email also identified areas of focus, strategies and tactics for each area of focus, and metrics for measuring

progress. Tuens' supervisor asked for her input and sought a second meeting to discuss the suggestions.

On July 3, the same supervisor sent Tuens a second email recapping a meeting held on June 30. The email indicates that Tuens had failed to meet the expectations with which she was hired, including achievement of the business plan she submitted during the hiring process. The email then reads, "Over the course of the last few months I have notified you of the need to focus on the level and quality of business development activity, and of the increasing urgency in sourcing and closing business. You and I have met a number of times to discuss business development and strategy. [¶] As we discussed on Friday, at this time the urgency in delivering results associated with your role is such that it has become necessary to establish a timeline within which you will be required to perform. Therefore, a condition of your continued employment at Ascent will be the sourcing and closing of two sales opportunities, the first by 9/30/2017 and the second one by 12/31/2017."

On July 20, 2017, Tuens was presented with the formal Action Plan conditioning her continued employment on "the sourcing and closing of two sales opportunities, the first one by 9/30/2017, and the second one by 12/31/2017." When the Action Plan was presented, Tuens had been employed by the Bank for a period of ten months, not including her leave time, and had not closed a new client or brought in any revenue.

In response to the Action Plan, Tuens sent an email to the human resources department noting that the plan was "silent on

3

the unexpected medical emergency (septic shock, a life threatening condition) that befell me in December 2016 which resulted in my being on medical leave from 12/12/16-3/27/17, four months in total," and stated "I had two viable prospects that fell away during that time." She further claimed she felt the Action Plan "punishe[d]" her for taking a medical leave to address a disability, and that "a reasonable accommodation would have been a better response."

In response to her email, the Bank agreed to revise the Action Plan, giving Tuens an additional three months to close the first of two clients such that she was then required to bring in two new clients by December 31, 2017, rather than one by September and the other by December.

On December 11, 2017, Tuens sent an email requesting further accommodation on the Action Plan. Tuens reported that "one piece of business" had closed. She identified two possible clients that had given her "verbal commitments to close in [Quarter 1] 2018" and described a "robust" pipeline of potential clients. She asked that, in evaluating her performance on the Action Plan, her "medical condition and extended recovery period be taken into consideration and accommodated." In "response to [her] request for accommodation," the Bank presented Tuens with a Final Action Plan, which conditioned her continued employment on sourcing and closing two clients, "each with an anticipated annual run rate at inception of at least $200,000," by February 28, 2018.

Tuens' employment was terminated in March 2018 after neither of the identified potential clients, nor any others, closed within the required timeframe.

In February 2020, Tuens filed a complaint alleging various causes of action based on her termination. As relevant here, her amended complaint alleges causes of actions under FEHA for disability discrimination, failure to accommodate, and failure to engage in the interactive process regarding accommodation.[2]

Following a bench trial, the court issued a statement of decision finding in favor of the Bank on all claims.

## DISCUSSION

### I. Standard of Review

" 'In reviewing a judgment based upon a statement of decision following a bench trial,' we 'apply a substantial evidence standard of review to the trial court's findings of fact.' [Citation.] Generally, 'our review begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations.' " (*Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 596 (*Symons*).)

---

[2] The trial court found that, prior to trial, Tuens abandoned her additional causes of action for age discrimination; gender discrimination; age harassment; gender harassment; wrongful discharge in violation of public policy; retaliation in violation of the California Family Rights Act and intentional infliction of emotional distress. The trial court also found that she waived her causes of action for disability harassment, retaliation, and failure prevent or correct harassment, discrimination, and retaliation by failing to assert them at trial. Tuens has not challenged these rulings on appeal.

5

However, when " ' "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals[,]" ' [citation] . . . ' " ' "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." ' " ' " (*Id*. at p. 597.)

## II.    Overview of FEHA

"FEHA makes it an unlawful employment practice to discharge a person from employment or discriminate against the person in the terms, conditions, or privileges of employment because of physical or mental disability or medical condition. (§ 12940, subd. (a).)  FEHA, however, 'does not prohibit an employer from . . . discharging an employee with a physical or mental disability, . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations . . . .' (§ 12940, subd. (a)(1).)" (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 231–232 (*Moore*).)

It is also "an unlawful employment practice" under FEHA for an employer to "fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m).)  The term "reasonable accommodation" is defined in the FEHA regulations only by means of example:  " 'Reasonable accommodation' may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] (2) Job restructuring, part-time or modified work

6

schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." (§ 12926, subd. (p); Cal. Code Regs., tit. 2, § 11068, subd. (a); accord, 42 U.S.C. § 12111(9).) "An employer is not required to make an accommodation 'that is demonstrated by the employer . . . to produce undue hardship . . . to its operation.' " (*Moore, supra,* 248 Cal.App.4th at p. 232.)

"Corresponding with the obligation to make reasonable accommodation for a known physical or mental disability, FEHA makes it unlawful for an employer 'to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.' [Citation.] Section 12940, subdivision (n) imposes separate, independent duties on an employer to engage in the ' "interactive process" ' and to make ' "reasonable accommodations." ' " (*Moore, supra,* 248 Cal.App.4th at p. 232.)

## III. Plaintiff's Disability

As relevant here, under FEHA, a " '[p]hysical disability' " includes "any physiological disease, disorder, condition . . . or anatomical loss" that both affects one or more defined body systems and "[l]imits a major life activity." (§ 12926, subd. (m).)

7

There is no dispute that Tuens was disabled within the meaning of FEHA while hospitalized between the end of December 2016 and the end of March 2017. The trial court found, and Tuens does not dispute, that she was no longer disabled within the meaning of FEHA when she returned to work on March 27, 2017.

In her email to the bank informing them of her return, Tuens wrote, "Good news!! [¶] My doctor has cleared me for an approved return to work date of Monday, March 27. [¶] I have handwritten note of approval from my doctor on a prescription pad that is signed. If that is sufficient for your purposes, let me know and I'll forward it along." The doctor's note on the prescription pad reads "Able to return to work 3/27/2017" and the doctor confirmed in her deposition that she intended the return to work to be full time. While Tuens suggests that the Bank was on "notice of the ongoing health problems experienced by Tuens following her leave" and that "her health continued to limit her after she returned from leave," Tuens did not present evidence or argue at trial that the "lingering effects" of her medical condition continued to limit a major life activity within the meaning of FEHA such that she should still be considered disabled upon her return to work.

Accordingly, as the trial court noted, Tuens' claims are "not based on a then-extant disability, but based on the residual effects of a *past* disability." Specifically, the trial court observed that Tuens was claiming that she was unable to perform as required by the Action Plans because of the "lingering effects of

8

her medical condition" and because she was "unfairly tagged for taking medical leave." On appeal, she reasserts that her claims are based on the alleged impact of the time lost to her disability and her "extended recovery and extended impairment" on her ability to secure new clients within the time required by the Bank.

## IV. Failure to Accommodate[3]

There is no dispute that the Bank accommodated Tuens' hospitalization by providing a leave of absence and holding her job open. Tuens contends, however, that the Bank failed reasonably to accommodate her disability on her return to work. She argues that the extensions of the performance deadlines in the Action Plan cannot be considered accommodations as a matter of law because they were not intended as accommodations and because they introduced new performance targets and expectations rather than simply extending deadlines. She asserts that "[s]uch revisions are not accommodative extensions but, rather, escalation of performance management leading to Tuens' discharge." She argues further that there is no substantial evidence in the record to support the trial court's finding that the accommodations offered by the Bank were reasonable due to the nature of her job.

Tuens' argument that the extensions were not intended to be accommodations was rejected by the trial court. In its

---

[3] We address Tuens' accommodation claims first insofar as those, rather than the discriminatory termination claim, appear to be the claims she has emphasized on appeal.

9

statement of decision, the trial court explained, "The Bank's interrogatory responses did not identify [the extensions] as accommodations, saying the medical leave was the only accommodation. As a fact finder, I could rely on the interrogatories and I could use them as impeaching trial evidence to the contrary. But I need not do so because the responses are not preclusive, and I choose instead to rely on the trial evidence." Tuens makes no attempt on appeal to argue that the court erred in declining to bind the Bank to its discovery response. Accordingly, any challenge to that decision has been forfeited. Tuens also cites to deposition testimony of a Bank employee as evidence that "the Final Action Plan issued in January 2018 was not a disability accommodation." But the Bank is not arguing that the Final Action Plan itself was an accommodation. Rather, it was the extension/revision of the existing performance requirements and deadlines that was the accommodation.

We also disagree with Tuens' argument that the extensions cannot be considered accommodations because they introduced new performance targets and expectations rather than simply extending deadlines. The record reflects that the first extension was just that—two new clients would be required by December, rather than one in September and one in December. While the second extension was, as the trial court noted, a "mixed bag" insofar as it gave Tuens an additional two months to perform but also required that she secure an additional client, Tuens cites no authority for her argument that the inclusion of an additional

10

performance requirement *necessarily* precludes consideration of the extension as an accommodation.

Finally, contrary to Tuens' argument, substantial evidence supports the trial court's finding that the that accommodations provided by the Bank were reasonable under the circumstances. (See *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 954 ["reasonableness of an accommodation" is an issue for the trier of fact].)  The court explained that the extensions gave Tuens what she had asked for—more time in which to secure new clients.  The trial court concluded that the initial three-month extension was reasonable based on Tuens' own characterization of the extension as "fair."  The court found that the second two-month extension was also reasonable in light of the information available to the Bank and Tuens at that time.  The court explained that, at the time of the extension, Tuens reported that she had verbal agreements for two clients and a robust pipeline. Thus, it was reasonable to believe she could meet the performance requirements in the time provided.  Ultimately, the court concluded that if the first extension was "fair," it would be "illogical to conclude that the accommodation issued in December—which was based on nothing more than the events which led to the July request for an accommodation—was either (i) needed or (ii) unreasonable."

Tuens argues that the extensions were not reasonable because she "had to essentially start from scratch in developing new client prospects following her extended leave," having lost her existing prospects during her leave, and because she had a

11

slow start due to her "ongoing health problems" after her return from leave.

The court, however, found that Tuens did not make a "substantial showing that any particular lead or prospect would have become an Ascent client but for Tuens' absence (or that the absence contributed to the fact that a lead did not become a client)." Consistent with the court's ruling, Tuens points to her testimony regarding her various leads prior to her leave, but cites no evidence supporting her claim that those leads likely would have become clients had she not gone on leave. Contrary to proving that Tuens lost leads during her medical leave, some of her testimony suggests that the four months lost to her leave were not critical to her client development. Specifically, Tuens testified that the one client she ultimately secured after her leave in October 2017 had given her a verbal agreement before her medical leave, but that it took approximately a year for her to close the client because the client "wasn't quite ready" in 2016. In contrast, Tuens' supervisor testified that the leave had no impact on her ability to develop business and that, at Tuens' request, he personally contacted two of her potential leads during her leave. Although Tuens claims that she lost viable leads as a result of her leave, the trial court, as the fact finder, was entitled to credit the Bank's evidence to the contrary.

Substantial evidence also supports the trial court's finding that the Bank reasonably required Tuens to secure three clients within 21 months of employment, or 17 months discounting her four-month leave. The trial court found that an essential

12

function of Tuens' employment was to secure "new business in a reasonable period of time" and that the expectations for her performance were "informed, if not literally controlled, by the business plan" that Tuens submitted prior to being offered the job and that the plan was a "good guide" to what parties understood to be a reasonable performance. Tuens suggests that the trial court's reliance on the business plan was misplaced and inconsistent with her testimony at trial that the typical "sales cycle" to generate new clients at Ascent was about a year to 18 months. She explains that she understood, based on her conversation with her supervisor, that bringing in two clients in a year would be considered "too few," four new clients would be considered excellent, and five would be "too many." Her testimony, however, proves the point that requiring that she secure two clients within 15 months and then three clients within 17 months was not "arbitrary," "burdensome," or unreasonable.

Tuens also contends that the extension offered in the Final Action Plan cannot be considered a reasonable accommodation because the plan imposed stricter client "metrics" by requiring that her new clients have "an anticipated annual run rate *at inception* of at least $200,000" rather than an anticipated run rate of $200,000 "*within the first 18 months from inception.*" The record, however, does not support her claim. Ascent's "New Business Acceptance & Fee Approval Guidelines" provides, "Ascent is selective about the type and number of clients we choose to work with. Each regional office team can only effectively work with approximately 20 families. It is important

13

that each client is a good fit with the Ascent model and approach, and that they provide a minimum of $200,000 of annual fee revenue." Tuens' supervisor explained that the anticipated "revenue requirement *at inception*" was "very important input into judging whether [a client] was a viable or not a viable business." (Italics added.) He acknowledged that there could be "instances where we would have prospects that that potentially would not be able to meet the $200,000 run rate revenue requirement at inception, but with significant visibility would be able to do so within 12 to 18 months," and that the bank "did not want to preclude those prospects from becoming clients." He explained, however, that this situation was "very much an exception" that required the client's circumstances to show "a very high probability of hitting $200,000 in run rate revenue within 12 to 18 months." Accordingly, the record supports a finding that the client qualification requirement imposed by the Final Action Plan was consistent with the Bank's existing policy.[4]

Finally, Tuens cites several cases, including *Workman v. Outfront Media LLC* (D.Mass 2020) 474 F.Supp.3d 373 and *Blum v. Stout Risius Ross, Inc.* (C.D.Cal. Nov. 28, 2017 No. CV 16-07382AB) 2017 U.S. Dist. Lexis 221663, for the proposition that "[a] widely recognized form of accommodation is to consider the

---

[4] At trial, Tuens testified that this requirement disqualified one of her prospective clients who was anticipated to generate $135,000 in annual fees at inception but who she believed would grow to meet the $200,000 annual run rate requirement. This testimony does not establish, however, that the requirement was stricter than the Bank's existing policy or that requiring her to comply with the policy was unreasonable.

14

impact of a medical leave on sales performance." In *Workman,* the employee was on medical leave for a month in January 2018. In April of that year, he was placed on a performance improvement plan, which required him to meet at least 50 percent of his annual sales target by the end of June. His employment was terminated at the end of June when he was at only 25.2 percent of his annual quota. (*Workman*, at p. 376.) The court denied the employer's motion for summary adjudication of the employee's failure-to-accommodate claim on the ground that genuine issues of material fact existed as to whether the employee requested a reasonable accommodation for his disability by asking for an adjustment to sales quota because of his medical leave. (*Id.* at pp. 376–377.) Similarly, in *Blum*, the court denied the employer's motion for summary adjudication of employee's failure-to-accommodate claim, finding a triable issue of fact as to whether the employee's request for a reduced revenue goal constitutes a request for a reasonable accommodation where the employee was terminated after failing to meet "revenue goals set for a full year's worth of work after [he] had missed months of work due to [his] illnesses or disabilities." (*Blum*, 2017 U.S. Dist. Lexis 221663 at p. *24.)

We are dealing here with trial court determinations following a bench trial, not summary adjudication decisions. Not only are *Workman* and *Blum* procedurally inapposite, but the trial court's decision in this case that the Bank's accommodations—providing Tuens additional time to meet her sales expectations—were reasonable and accounted for the time

15

lost to her disability is entirely consistent with *Workman* and *Blum* even assuming that, at trial in those cases, the employers were found liable for failure to accommodate in violation of FEHA.

## V.    Interactive process

"While a claim of failure to accommodate is independent of a cause of action for failure to engage in an interactive dialogue, each necessarily implicates the other."  (*Moore, supra,* 248 Cal.App.4th 216, 242.)  Indeed, in order to "prevail on a claim for failure to engage in the interactive process, the employee must identify a reasonable accommodation that would have been available at the time the interactive process occurred."  (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 379 (*Nealy*); accord, *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 984 [it is the employee's burden to prove reasonable accommodation was available].)

On appeal, Tuens suggests that a more reasonable accommodation than the extensions provided would have been to require that she secure only one client by September, as initially mentioned by her supervisor, and then to credit her for substantially complying with that deadline when she closed a client during the first week of October.  Alternatively, she argues that the Bank could have extended the December deadline without requiring her to find an additional client.  As the trial court observed, however, "[t]he basic flaw in these suggestions is that they are untethered to any theory of Tuens' essential duties."

16

FEHA does not obligate an employer to provide an accommodation that would effectively eliminate performance of the essential functions of a job. (See *Nealy, supra,* 234 Cal.App.4th at p. 375 ["The examples of reasonable accommodations in the relevant statutes and regulations include reallocating nonessential functions or modifying how or when an employee performs an essential function, but not eliminating essential functions altogether"].) The trial court found that Tuens' "essential duties were to bring in new clients, an obligation at least roughly stated as a number of clients within certain time periods, mapped out by the business plan on which the Bank relied when bringing her on board." The court also found that "[w]hile reasonable minds might differ on whether some intermediate number—say 4 new clients—within (say) 13 months—might be a reasonable approximation of her essential job duties, it's plain that one new client in that time period isn't." Accordingly, Tuens' proposals—requiring that she secure only one new client in 13 months of employment or two new clients in 17 months—substantially modify or eliminate the essential functions of her job. Accordingly, contrary to Tuens' argument, the Bank was not required to consider them as possible accommodations. (See *Borkowski v. Valley Central School Dist.* (2d Cir. 1995) 63 F.3d 131, 138 [employee's prima facie showing that a reasonable accommodation is available requires that she "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits"].)

17

*Swanson v. Morongo Unified School Dist.* (2014)
232 Cal.App.4th 954 and *Humphrey v. Memorial Hospitals Ass'n*
(9th Cir. 2001) 239 F.3d 1128 (*Humphrey*), like *Workman* and
*Blum,* two principal cases plaintiff relies upon in support of her
reasonable accommodation argument, are both procedurally
inapposite and distinguishable on the merits.  In *Swanson*, the
court held that an employer was not entitled to summary
adjudication of the employee's claim for failure to engage in the
interactive process when the employer merely switched the
employee's job assignment as an accommodation without
considering an alternative job assignment she had requested and
believed was necessary to accommodate her disability.  (*Swanson*,
at p. 972.)  Unlike in *Swanson*, Tuens did not request any specific
accommodation and agreed in July that the extension was "fair."
When Tuens asked for an additional accommodation in
December, nothing in her letter suggested that she was
requesting anything other than additional time in which to meet
the performance standards.  Based on the information Tuens
provided, the Bank provided an additional extension and revised
the requirements.  Tuens did not object and, as discussed above,
has not identified any additional accommodation that the Bank
reasonably should have considered at that time.

In *Humphrey*, another summary judgment case, the court
held there was enough evidence to justify a trial on the plaintiff's
allegations that the employer failed to engage in the interactive
process, despite providing an initial accommodation, when it
became clear that the accommodation was not succeeding and the

18

employee requested an alternative accommodation.  (*Humphrey*, *supra*, 239 F.3d 1128, 1138.)  Crediting the plaintiff's evidence, as it was required to do on summary judgment, the court explained that at that point, the employer had a duty to explore further arrangements to reasonably accommodate the employee's disability, and that "[r]ather than fulfill its obligation to engage in a cooperative dialogue," the employer denied the employee's request "without suggesting any alternative solutions, or exploring with her the possibility of other accommodations." (*Ibid*.)  By contrast, in this case, when the Bank was advised that Tuens would not be successful under the initial extension, it offered an additional, alternative accommodation based on the information Tuens provided.

## VI.    Disability Discrimination

To prove her claim for disability discrimination, Tuens was required to prove that she "(1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability."  (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 310.)

California has adopted the three-stage burden-shifting test for discrimination claims set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–356.)  "This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional

discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz,* at p. 354.) "At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled." (*Id*. at pp. 354–355.) "If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises." (*Id*. at p. 355.) "Accordingly, at this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason." (*Id*. at pp. 355–356.) "If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias." (*Id*. at p. 356.)

The trial court found that Tuens failed to make a prima facie showing that she was able to perform the essential duties of

her job with or without an accommodation. It found further that, even assuming she had made a prima facie showing, the Bank had demonstrated that her termination was based on non-discriminatory, performance-based grounds and that Tuens failed to prove that the Bank's reason for her termination was pretextual. Substantial evidence supports the trial court's findings.[5]

Without belaboring the point, the evidence discussed above established that Tuens secured only one new client in 17 months of work, which under her own estimation of her performance standard was "too few." Accordingly, the record supports the trial court's finding that she failed to make a prima facie showing that she was able to perform the essential duties of her job with or without an accommodation. The judgment could be affirmed on this ground alone.

Although we need not reach her additional argument, we find that the record also supports the trial court's finding that Tuens failed to prove that the Bank's performance-based reason

---

[5] Although Tuens describes the July Action Plan as retaliatory and discriminatory, she makes no argument that imposition of the plan constituted an adverse employment action. (See *Agnew v. BASF Corp.* (6th Cir. 2002) 286 F.3d 307, 310 [a performance plan that is "contingent on future developments," even if it includes a warning of possible termination, does not constitute an adverse employment action where the employee continued to work in the same job with the same benefits]; see also *Grube v. Lau Industries, Inc.* (7th Cir. 2001) 257 F.3d 723, 729 ["unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"].)

for her termination was pretextual. Tuens argues that the Bank's proffered reason was pretextual based on the following "key indicators" and evidence: (1) Receipt of her full bonus in December 2016, prior to her leave, demonstrates that the Bank considered her performance prior to her disability to be satisfactory; (2) the adverse actions began almost immediately upon her return; (3) the performance expectations imposed by the Bank "were inconsistent and changed without explanation;" (4) the Bank failed to produce sales pipeline records that could have illuminated Tuens' progress before and after her leave, despite having the ability to do so; (5) the Bank's trial witnesses repeatedly contradicted sworn discovery responses, undermining the credibility of its defenses; and (6) the Bank violated its own policies by failing to investigate Tuens' complaint that she was being punished for taking medical leave. Most of the evidence relevant to these "key indicators" was discussed above and need not be rehashed. We emphasize, however, that Tuens' characterization of the performance expectations imposed by the Bank as inconsistent or changing without explanation is not supported by the trial record. As discussed above, the Bank, consistent with its existing policies and expectations, required Tuens to secure two, then three, new qualified clients within 15, then 17, months. (See *ante*, at pp. 10–14.) In any event, this evidence does not overwhelmingly establish pretext, as Tuens suggests. (See *Symons*, *supra*, 99 Cal.App.5th at pp. 596–597 [when the trier of fact has expressly concluded that the party with the burden of proof did not carry the burden, the question

22

for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law].)  Based on Tuens' own estimation, the process of developing and securing new clients can take, at times, between 12 and 18 months.  Even assuming that she was performing well enough during the first six months of employment, that does not establish that concerns about her performance raised after she failed to secure a single client after a year of employment were pretext for discrimination.

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to recover their costs on appeal.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
SIMONDS, J. *

---

* Judge of the Superior Court of Sonoma County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.