**Lana VELENTE–HOOK, Plaintiff,**

v.

**EASTERN PLUMAS HEALTH CARE, Defendant.**

**No. CIV S–04–645LKKGGH.**

United States District Court, E.D. California.

April 28, 2005.

Peter Scott Rukin. Stephanie Doria, Rukin, Hyland, Doria & DeFrane, LLP, San Francisco, CA, for Plaintiff.

Jeremy Seth Millstone, Millstone Peterson & Watts, LLP, Roseville, CA, for Defendant.

## ORDER

KARLTON, Senior District Judge.

Plaintiff, Lana Velente–Hook, brings various state and federal claims against her former employer, Eastern Plumas Health Care (hereinafter "EPHC"), alleging that it unlawfully discriminated and retaliated against her based on her disability. Plaintiff's claims are brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940 et seq. ("FEHA"), and California Health and Safety Code § 1278.5 ("Safety Code"). This matter comes before the court on the defendant's motion for summary judgment or, alternatively, partial summary adjudication. I decide the motion based on the papers and pleadings filed herein and after oral argument.

## I.

### BACKGROUND

Plaintiff began working for the defendant as a licensed, vocational nurse at EPHC in Portola, California, during July of 2000. Plaintiff was diagnosed with breast cancer in March, 2003, and subsequently went on a four-month medical leave to undergo surgery, chemotherapy, and radiation treatment. During a meeting in June 2003, EPHC notified plaintiff that she would need to return to work at the end of her leave, beginning July 1, 2003. According to the plaintiff, she explained to her supervisor, Lorraine Noble, and the director of Human Resources, Cathy Conant, that she was medically unable to return to work and requested additional leave. Conant responded that she had

exhausted her leave and denied her request.

Plaintiff returned to work on a part-time schedule in July of 2003. According to plaintiff, however, EPHC continuously refused to accommodate her medical condition and discriminated against her. She complains that EPHC denied her leave several times, refused to provide her with part-time shifts and a transfer to a hospital closer to her home, and also harassed, threatened, and retaliated against her.

## II.

### SUMMARY JUDGMENT STANDARDS UNDER FED. R. CIV. P. 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Sicor Limited v. Cetus Corp.*, 51 F.3d 848, 853 (9th Cir.1995).

■ Under summary judgment practice, the moving party

[A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Sicor Limited*, 51 F.3d at 853.

■ In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *See also First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575; *Rand v. Rowland*, 154 F.3d 952, 954 (9th Cir.1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper*

*Workers,* 971 F.2d 347, 355 (9th Cir.1992) (quoting *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Cline v. Industrial Maintenance Engineering & Contracting Co.,* 200 F.3d 1223, 1228 (9th Cir.2000).

■ In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank,* 391 U.S. at 290, 88 S.Ct. 1575; *See also T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *see also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985).

■ In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *See also In re Citric Acid Litigation,* 191 F.3d 1090, 1093 (9th Cir.1999). The evidence of the opposing party is to be believed, *see Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *see Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam* )); *See also Headwaters Forest Defense v. County of Humboldt,* 211 F.3d 1121, 1132 (9th Cir.2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

### III.

### FACTS [1]

The defendant, EPHC, is a health services provider with "campuses" in Portola and Loyalton. Def.'s Statement of Undisputed Facts ("Def's SUF") at ¶ 1. Plaintiff began working for the defendant as a licensed, vocational nurse at the Portola campus during July of 2000 and remained there until December 21, 2004. *Id.*

### A. EPHC'S LEAVE POLICIES

EPHC provides a four-month medical leave of absence, during which the employee's job classification and pay rate are held and the employee continues all insurance benefits. *Id.* at ¶ 5. EPHC also provides a personal leave of absence, at the discretion of the CEO, for up to four months with a continuation of all insurance benefits. *Id.* at 6. If an employee returns to work within 12 months of separation, credit is given for

---

**1.** The facts are undisputed, unless otherwise noted.

prior seniority, however, the employee is not guaranteed to return to the same position or pay rate under this policy. *Id.* at 7.

## B. PLAINTIFF'S MEDICAL LEAVE

On March 1, 2003, plaintiff was diagnosed with breast cancer and immediately took a four-month medical leave of absence to undergo surgery, chemotherapy, and radiation treatment. Def.'s SUF at ¶ 13. Pursuant to EPHC's policy, her medical leave guaranteed reinstatement to her job classification and pay rate and continuation of insurance benefits. *Id.* at 14. Her physician's note to defendant stated that she might be able to return to work on July 1, 2003. *Id.* at 13.

In early June of 2003, plaintiff met with her supervisor, Lorraine Noble, and Personnel Coordinator, Cathy Conant, to discuss her anticipated return to work. Def's SUF at ¶ 15. During the meeting, plaintiff informed Conant and Noble that she was incapable of returning to her nursing duties, Def's SUF at ¶ 19, and requested an extension of her leave until she finished chemotherapy. *Id.* at 16. Conant however, does not recall this request. *Id.* at 17. Conant explained that EPHC's medical leave policy allowed for only a four-month leave, *id.,* and that the plaintiff would have to return to work at the expiration of her leave or be removed from the payroll. *Id.* at 18. Noble, Conant and plaintiff discussed the creation of a chart-auditing position as a possible accommodation. *Id.* at 20. Conant also advised plaintiff that EPHC needed medical certification from her physician regarding her ability to return to work and any limitations. *Id.* at 22. Noble assured plaintiff that she would schedule plaintiff's shifts to best accommodate her reaction to the ongoing chemotherapy treatments. *Id.* at 25.

Subsequent to the June 2003 meeting, plaintiff provided EPHC with a notice from her physician, Dr. Reddy, dated June 12, 2003, stating that the plaintiff may return to full nursing duty for two days a week, with 12–hour shifts beginning July 1st. *Id.* at 23. It also stated that she was able to resume her usual hours sometime in September. *Id.* On July 1, 2003, the plaintiff returned to work under this modified schedule. *Id.* at 26.

Once plaintiff returned to work, she informed Noble that she was tired and was experiencing some problems with her feet. Def.'s SUF at ¶ 28. She requested that she be allowed to wear open-toed shoes rather than the traditional, closed-toe nursing shoes. *Id.* Noble approved this request. *Id.* at 29.

On several occasions, plaintiff was too tired at the end of her shift to complete the 30–mile drive home from work and had to pull over to sleep. Def's SUF at ¶ 31. After concerned colleagues informed Noble of the plaintiff's inability to complete her drive home, *id.* at 32, Noble and Conant scheduled a meeting with the plaintiff for August 8, 2003 to discuss issues relating to her schedule and ability to work, *id.* at 34.

On August 6th, plaintiff went to Conant's office to "seek counsel" about the scheduled meeting. Def.'s SUF at ¶ 37. Plaintiff told Conant that she would not be capable of working an additional 12–hour shift in September. *Id.* at 38. Maxine Flora ("Flora"), Chief Nursing Officer, joined Conant and the plaintiff, *id.* at 35, to explain the scheduling issues to the plaintiff, *id.* at 40. The plaintiff ended the August 6th meeting by stating that she was going to seek legal advice. Plaintiff called in sick for her next two shifts and did not attend the August 8th meeting. *Id.* at 44.

On August 8th, Conant, Flora and Noble met and discussed how to address the situation with the plaintiff and decided to require the plaintiff to be evaluated for

duty fitness. *Id.* at 45. Later that day, plaintiff came to the hospital to provide Conant with a letter stating that she was not capable of working even part-time. *Id.* at 46. The plaintiff then went to pick up her paycheck from Flora. *Id.* Conant was on Flora's speaker phone during the exchange between Flora and plaintiff. *Id.* at 50. Defendant claims, and plaintiff disputes, that plaintiff was so agitated that Conant was concerned about the possibility of the plaintiff becoming violent that she called security. *Id.*

Sometime between August 8, 2003 and August 21, 2003, Charles Guenther, EPHC's CEO, received Dr. Reddy's letter which plaintiff had delivered to Conant on August 8th. Def.'s SUF at 51. Guenther responded to Dr. Reddy with a letter describing EPHC's attempts to accommodate the plaintiff. *Id.* at 52. He advised Dr. Reddy that, given plaintiff's inability to work and that she had exhausted her medical leave, she would be "suspended" on the payroll system "until she is able to return." *Id.* Guenther believed that offering the plaintiff a personal leave of absence was inappropriate because she had refused to participate in the August 8th meeting. *Id.* at 53.

On August 26, 2003; plaintiff's attorney contacted EPHC requesting that Guenther contact him to discuss reasonable accommodations. Def's SUF at 55. By September 16, 2003, through the efforts of their attorneys to reopen the interactive process, the plaintiff and EPHC agreed that plaintiff would continue a personal leave of absence and retain her benefits through December 31, 2003. *Id.* at 57, 58.

On November 3, 2003, plaintiff wrote EPHC a letter in which she requested certain accommodations upon return from her personal leave of absence. Def's SUF at 59. Plaintiff requested that EPHC provide her (1) a part-time position consisting of (2) two 12–hour shifts on Thursday and

Friday, and (3) a transfer to the Loyalton facility. *Id.* at 60. Plaintiff did not provide any medical documentation to support these accommodations. *Id.* at 61.

By letter dated November 25, 2003, Guenther agreed to accommodate plaintiff with a part-time position, but explained that, "for the time being," he could not guarantee the night shift or make the transfer to Loyalton. *Id.* at 68–69. Guenther also advised the plaintiff that upon her return, it would be necessary to discuss the incident that occurred on August 8th to determine appropriate corrective action. *Id.* at 70. Guenther further requested that plaintiff provide medical documentation relating to her return to work. *Id.* at 71. Guenther invited plaintiff and her attorney to a meeting to discuss the referenced corrective action and then agreed to extend the plaintiff's leave to January 15, 2004, if necessary. *Id.* at 72–73.

Guenther did not receive a response from plaintiff until he received her December 24, 2003 letter in which she accused Guenther of retaliation and stated she could not subject herself to "further hostile treatment" given her current medical condition. Def.'s SUF at 75. Guenther interpreted and accepted this letter as her resignation and so advised her by letter dated December 31, 2003. *Id.* at 76. Guenther did not further communicate with plaintiff. He asserts that he believed that any attempt to communicate would have been interpreted as harassment. *Id.* at 77. Plaintiff did not respond to Guenther's December 31st letter. *Id.* at 78.

The plaintiff has not been employed in any capacity since January 1, 2004. Def.'s SUF at 9. Plaintiff has received state disability benefits from March of 2003 until March/April of 2004 and Social Security benefits from March/April 2004 through the present. *Id.* at 12.

# IV.

## ANALYSIS

### A. FAILURE TO ACCOMMODATE

Plaintiff contends that the defendant violated the ADA and FEHA when it continuously failed to provide a reasonable work accommodation during and following her treatment of breast cancer. She alleges that the violations occurred on numerous occasions over the course of her employment, culminating in her constructive discharge. Below, I examine her contentions in the order presented by her.

■ The ADA prohibits employers from discriminating against a qualified individual with a disability based on that disability. Such discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual[,] ... unless the covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).[2] A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

#### 1. *June, 2003*

Plaintiff contends that the defendant first failed to meet its obligations under federal and state disability laws when she returned to work after a four-month medical leave of absence which she took after being diagnosed with breast cancer. In early June, 2003, plaintiff met with Noble and Conant to discuss the termination of her medical leave and anticipated return date of July 1, 2003. Def's SUF 15.

Plaintiff contends, and defendant disputes, that plaintiff requested additional leave until the completion of her chemotherapy treatment. Depo. of Lana Valente–Hook (Valente–Hook Depo.) at 35:22–36:14. Whether or not plaintiff made this request, it is undisputed that, in discussing her return to work, Conant "explained [to plaintiff] that EPHC's medical leave of absence is 4 months [and that] [i]f an employee is unable to return to work, [the] policy is that the employee suffers a loss of benefits and is removed from the payroll." Def's Exh. I to Br. in Supp. of Mot. According to Conant, a removal from payroll meant that plaintiff would cease to be a hospital employee. Depo. of Cathy Conant (Conant Depo.) at 29:16–19.

■ As plaintiff contends, defendant unlawfully failed to provide a reasonable accommodation when it flatly refused to provide additional leave, since, according to the employer's policy, and as Conant admits, a personal leave of absence was a viable option. Conant Depo. at 85:3–86:9. Although it is disputed whether plaintiff informed Conant and Noble that she was precluded from returning to work during her chemotherapy, it is undisputed that Conant was aware that plaintiff was undergoing chemotherapy at time. Conant Depo. at 31:17–25. Accordingly, even if plaintiff had not specifically requested additional leave, defendant may still be found liable for not raising and exploring that possible accommodation on its own. As the Ninth Circuit has explained, because "[e]mployees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have," em-

---

**2.** Because the FEHA provisions relating to disability discrimination are based on the ADA, decisions interpreting the ADA are relevant to interpreting the FEHA's similar provisions. *See Brundage v. Hahn*, 57 Cal.App.4th 228, 235, 66 Cal.Rptr.2d 830 (1997). Accordingly, I analyze plaintiff's state and federal disability claims together, relying on federal authority in the absence of contrary or differing state law.

ployers may not place the entire burden on the employee to identify a reasonable accommodation since "they do not have the superior knowledge of the workplace that the employer has." *Barnett v. U.S. Air,* 228 F.3d 1105, 1113 (9th Cir.2000).

■ Defendant defends its failure to explore personal leave on the grounds that it "was not legally required" to grant plaintiff a personal leave "while she completed her chemotherapy." Def's Br. in Supp. of Mot. at 11. Defendant is mistaken. The Ninth Circuit has explicitly stated that "[a] leave of absence for medical treatment may be a reasonable accommodation under the ADA." *Humphrey v. Memorial Hospitals Ass'n.,* 239 F.3d 1128, 1135 (9th Cir. 2001) (citing 29 C.F.R. 1630 app. § 1630.2(*o*)). Here, despite defendant's erroneous understanding of its legal obligation, it was required to grant plaintiff a personal leave of absence because it "would [have] reasonably accommodate[d] [plaintiff's] disability and permit[ted][her], upon [her] return, to perform the essential functions of the job." *Id.* at 1135–36. Further, defendant nowhere argues such an accommodation would have imposed a hardship. Instead, the evidence clearly shows that defendant simply did not consider a personal leave of absence.

Defendant maintains that, despite its failure to provide a personal leave, it provided other reasonable accommodations when it considered a modified work schedule. According to defendant, Noble and Conant discussed creating a desk "chart audit position" as a possible accommodation after plaintiff indicated that she was incapable of performing her regular nursing duties upon her return to work. Def's SUF 19, 20. This attempt to accommodate plaintiff's disability, however, proved fruitless, as Guenther disapproved of the position and it was never offered to plaintiff. Conant Depo. at 34:4–35:18.

■ In the alternative, defendant asserts that the law does not require employers to create a new position as an accommodation or to reassign an employee to another position unless it is vacant. *See Watkins v. Ameripride Serv.,* 375 F.3d 821, 829 (9th Cir.2004). Although defendant is correct in that assertion, it had an affirmative duty to explore other possible accommodations, which it did not do.

■ Lastly, defendant argues that, regardless of any flaws in its actions during June, 2003, it cannot be held liable under the ADA or FEHA because it ultimately granted plaintiff's request to work part-time upon her return on July 1, 2003. Again, however, defendant's efforts fall short of that required by the ADA and FEHA.

On June 12, 2203, plaintiff submitted a doctor's release, as required to prevent her from being removed from payroll. The release indicated that plaintiff could return to full nursing duty for two days a week with 12 hour shifts. Def's SUF 23. As defendant asserts, plaintiff was allowed to return to work on that schedule. While, at first glance, it may appear that this action satisfied the ADA, placed in context, the accommodation was not reasonable or "effective[ ] in enabling [plaintiff] to perform the duties of the position." *Barnett,* 228 F.3d at 1115. During the June, 2003 meeting, defendant gave plaintiff two options: (1) lose her benefits and be removed from payroll if she could not return to work starting July 1, 2003, or (2) provide proof that she was able to return to work, in which case she could continue her benefits and EPHC would attempt to accommodate any limitations. At that point, then, defendant had already decided that it would not contemplate any accommodations whatsoever if plaintiff could not return to work as of July 1st. Defendant's purported accommodation was effectively a

Hobson's choice. As plaintiff explained during her deposition, even though she felt that she could not return to work, she felt forced into asking her doctor for the work release so that she could maintain medical insurance to pay for her $5,000 per session chemotherapy.

Further, the record contains evidence that could support a finding that plaintiff's doctor would not have released her to work, even part-time, if defendant had not foreclosed the possibility of accommodating her inability to return to work on July 1st. Plaintiff's doctor wrote a letter in early August, 2003 stating that, when plaintiff first indicated she would have to return to work no later than July 1, 2003, he "was not comfortable with that," and that, when she again informed him that she would lose her position and medical benefits if she did not meet that requirement, he "reluctantly" "release[d] her to her nursing duties part-time." Exh. 2 to Def's Br. in Supp. of Mot. Had defendant explored other accommodations in good faith, it would have found that even a part-time schedule was not an effective accommodation. Because a jury could find that defendant failed to provide a reasonable accommodation on the grounds that it unilaterally limited the possibility of accommodations when it required plaintiff to return to work, summary judgment must be denied as to this claim.

**2. August, 2003**

Defendant contends that it provided plaintiff with a reasonable accommodation during August, 2003, when it granted her a personal leave of absence from September of 2003 through December 31, 2003. Def's SUF 57. I examine this contention below.

During August, 2003, the parties engaged in a series of conversations and meetings regarding plaintiff's work status. These communications were ineffective, however, in resolving questions regarding plaintiff's working ability and accommodations for her radiation treatments which were to begin in September. It is undisputed that it was not until plaintiff obtained counsel that, through communications with defendant's counsel, defendant granted plaintiff a discretionary personal leave. Defendant asserts that, although it did not provide the leave "upon demand," it complied with its legal obligation when it ultimately granted the personal leave. Plaintiff does not allege that defendant failed to accommodate her during this period. Rather, plaintiff points to these events to support her claim for failure to engage in the interactive process. Accordingly, the court determines that defendant provided plaintiff with a reasonable accommodation during August of 2003.

**3. January, 2004**

 Plaintiff alleges that defendant again violated the ADA and FEHA because it failed to reasonably accommodate her disability when she sought to return to work at the end of her personal leave. In response, defendant argues that summary judgment must be granted in its favor because an accommodation was actually provided, but was rejected by plaintiff. As I explain below, there are material factual disputes which preclude the court from granting summary judgment.

Through a letter dated November 23, 2003, plaintiff requested the following work accommodations upon her return to EPHC on January 1, 2004:(1) "to have [her] full time status changed to two 12-hour shifts per week as a regular employee of the hospital," (2) "to be transferred to Loyalton Hospital," rather than returning to the Portola Hospital, (3) to maintain a night-time shift, and (4) to work Thursday and Friday nights. Def's Exh. M to Br. in Supp. of Mot. for Summ. J. According to plaintiff, these accommodations had been discussed with her doctor in anticipation of her return date, Valente-

Hook Depo. at 181:8–24, and were necessary to "reduce the stress on [her] immune system and physical stamina," Def's Exh. M to Br. in Supp. of Mot. for Summ. J.

Guenther responded by letter on November 25, 2003, stating that EPHC was willing to allow plaintiff to work on a part-time schedule, but that it was not, "for the time being," willing to "accommodate [her] at the Loyalton campus or on the night shift." Def's Exh. N. Defendant contends that this offer provided a reasonable and sufficient accommodation under the ADA and FEHA because it was not obligated to provide plaintiff the particular accommodation she requested.

While, as defendant points out, employers are not required to grant the accommodations specifically requested by employees, employers must nonetheless provide an *effective* accommodation to "enable [plaintiff] to perform the duties of the position." *Barnett,* 228 F.3d at 1115. Here, the record contains evidence upon which a trier of fact could find that the accommodation proposed by Guenther was not reasonable and effective. First, Guenther failed to address plaintiff's concerns that requiring her to work at the Portola Hospital would affect her stamina and immune system, which would naturally affect her ability to perform her nursing duties. As early as August of 2003, EPHC became aware that the 60–mile round trip commute to the Portola hospital fatigued plaintiff so much that "by the time she [got] off duty she [was] … unable to drive home and ha[d] been pulling off the road to sleep some and then continue home." Def's Exh. G to Br. in Supp. of Mot. for Summ. J. Through her November 23rd

letter, Guenther learned that the Loyalton hospital was only four miles away from her home, which would greatly reduce the stress of the commute. Despite being on notice of the difficulties the Portola commute placed on her ability to fulfill her work duties, Guenther made no effort to verify with her physician whether plaintiff's condition had improved so that the commute would no longer create complications. Second, only several months prior to Guenther's November 25, 2003 decision, plaintiff's doctor had informed EPHC that a day shift could compromise plaintiff's immune system because of the "high potential for infection" caused by high patient traffic. Def. Exh. G to Br. in Supp. of Mot. for Summ. J. Again, before investigating whether, in her doctor's opinion, such a limitation still existed, he unilaterally denied her request to continue to work night shifts upon her return in January of 2004.

Defendant attempts to show that Guenther's decision was only temporary and that his letter contemplated further discussion regarding her accommodations. The November 25th letter states that, "[t]o facilitate this process and expedite your return to work, I would suggest that … we have correspondence from your treating physician as soon as possible" "regarding your current medical condition." *Id.* at Exh. N. These statements do not necessarily support defendant's position, however, since a trier of fact could reasonably find these statements to mean that plaintiff was required to submit a release from her physician, as had been demanded of her in the past. Regardless, these statements do not by themselves demonstrate that defendant provided a reasonable accommodation.[3]

---

3. Defendant further defends Guenther's decision by stating that he "invited [plaintiff's] attorney's participation" to discuss additional accommodations. Br. in Supp. of Mot. for Summ. J. at 12. Defendant mischaracterizes

Guenther's letter. The letter nowhere mentions future discussions regarding additional accommodations, but rather invites her attorney to join a discussion regarding "appropriate corrective action" for her alleged miscon-

Further, as plaintiff asserts, a trier of fact could also find that defendant failed to provide a reasonable accommodation when it failed to explore other possible assignments for her at the Loyalton campus. In response, defendant maintains that the refusal to grant the transfer to Loyalton was based on "legitimate business concerns." According to Guenther, pursuant to his inquiry, the Director of Nursing at the Loyalton facility, Tina Sloan, complained about plaintiff's work performance, interpersonal relationships and level of training and certification. Def's SUF 63 & 66. Based on Sloan's opinion, Guenther determined that he should not grant plaintiff's transfer.

Defendant apparently seeks to establish that plaintiff was not qualified to work at Loyalton Hospital. Guenther admits, however, that he did nothing to independently verify plaintiff's performance or qualifications while she was an employee at Loyalton more than three years earlier. Depo. of Charles R. Guenther Depo.("Guenther Depo.") at 123:14–125:22. Further, defendant does not dispute that plaintiff's personnel file contained work evaluations indicating that her performance met or exceeded expectations. Exh. 24. Other than allegedly relying on Sloan's account, defendant nowhere claims that plaintiff lacked the skills, training, or experience to work as a nurse at either of its hospitals. Therefore, Guenther's explanation appears to be a mere pretext that cannot overcome plaintiff's evidence that he failed to explore job positions at the Loyalton hospital in good faith.

It is well settled that "[l]iability [under the ADA] is appropriate if a reasonable accommodation without undue hardship to the employer would otherwise have been possible." *Humphrey*, 239 F.3d at 1139. Because, as explained above, a trier of fact may find that EPHC failed to provide a reasonable accommodation where one was possible, defendant's motion for summary judgment on plaintiff's failure to accommodate claims must be denied.

## B. FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS

Defendant also seeks summary judgment on plaintiff's causes of actions seeking to hold it liable for failing to engage in the interactive process. As I explain below, the defendant's motion must also be denied as to these claims.

 The ADA and the FEHA require that employers and employees engage in a good-faith interactive process to explore a reasonable accommodation.[4] As the Ninth Circuit has explained:

> The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees ... to identify an accommodation that allows the employee to perform the job effectively. Both sides must communicate directly, exchange essential information, and neither side can delay or obstruct the process.

*Barnett*, 228 F.3d at 1114–1115. In examining these types of claims, the court must "attempt to isolate the cause of the breakdown [in the interactive process] and then assign responsibility so that liability ... ensues only where the employer bears responsibility for the breakdown." *Id.* at 1114 (internal citation omitted). "Employers who fail to engage in the interactive process in good faith face liability for the remedies imposed by the statute if a rea-

---

duct during a meeting held on August 6, 2003.

4. The standard for FEHA violations for the failure to engage in the interactive process tracks the standard set for the ADA violations in the Ninth Circuit.

sonable accommodation would have been possible." *Humphrey,* 239 F.3d at 1137–1138.

### 1. *June, 2003*

Plaintiff alleges that defendant failed to act in good faith during the June, 2003 interactive process when it flatly denied any possibility of accommodation unless she returned to work on July 1, 2003 and when it did not explore modified positions. Defendant contends that it cannot be held liable for its actions during June of 2003 because plaintiff was ultimately accommodate when she was allowed a part-time schedule. For the reasons explained in part one of section A, *supra,* defendant's contention has no merit and the motion must be denied.

### 2. *August, 2003*

▇▇▇ Defendant contends that it re-initiated the interactive process in August of 2003 but that plaintiff twice acted in bad faith and disrupted that process. I examine this contention below.

At the beginning of August, 2003, Noble received a schedule change request from plaintiff to accommodate her college schedule. At the same time, Noble learned from plaintiff's coworkers that she was having difficulty with her part-time schedule and was experiencing major fatigue that affected her ability to drive home after work. Subsequently, Noble scheduled to meet with plaintiff, Conant, and Maxine Flora, defendant's then new Chief Nursing Officer, on Friday, August 8, 2003 to discuss these issues. Plaintiff asserts, and defendants dispute, that Noble informed her that a purpose of the meeting was to discuss whether plaintiff would return to work full-time starting September 1, 2003. Valente–Hook Depo. at 100:3–101:10.

On August 6, 2003, plaintiff went to Conant's office "to seek counsel on how to handle" the scheduled meeting. Valente–Hook Depo. at 110:11–16. She told Conant that she could not come back to work full-time starting in September and that she also "didn't want to handle the meeting inappropriately." *Id.* at 110:17–18. After receiving a call from Conant, Flora joined the plaintiff in Conant's office. The record is somewhat unclear about what transpired during this meeting. Plaintiff asserts that she was repeatedly told by both Conant and Flora that she had exhausted all of her leave and had to return to work full-time or that she would face being removed from pay-roll and losing her medical benefits. Valente–Hook Depo. at 116:21:133. Defendant, on the other hand, contends that Flora and Conant stressed that no decisions had been made regarding her work status, that she would need a further medical evaluation, and that a further discussion would be held during the August 8th meeting. The parties agree that the August 6th meeting became heated and that plaintiff was emotional. Defendant asserts, and plaintiff denies, that she was hostile and used vulgar language to Flora. Defendant points to plaintiff's behavior during the August 6th meeting as evidence of plaintiff's bad faith and full responsibility for the breakdown of the interactive process.

The record, however, also contains evidence supporting plaintiff's position that it was defendant that demonstrated bad faith during this meeting when Conant and Flora repeated that there was no option or possible accommodation available other than for plaintiff to return to work full-time starting September 1, 2003. Plaintiff avers that the defendant's unwillingness to consider other accommodations during her weakened physical and mental state caused her emotional breakdown during that meeting. According to plaintiff, then, it was the defendant's behavior during this meeting that interrupted the interactive process.

The record contains evidence allowing a jury to find that defendant acted in bad faith during the August 6th meeting. Conant admits that she explained to plaintiff that she "ha[d] exhausted her extended disability benefits, medical leave and FMLA leave options" and that "if she could not work, she would be entitled to SDI [State Disability Insurance]." Def's Exh. J. Flora stated that she and Conant "expressed repeatedly that [they] had no intention of forcing her to return to work," but explained to her that defendant was having "difficulty . . . accommodating her currently and that she was to return to full time by September 1, 2003." Depo. Exh. 6; Flora Depo. at 49:2–51:3. Based upon these statements, a jury could reasonably find that defendant simply gave plaintiff more of the same when Conant and Flora indicated that there was no possibility for accommodations unless she returned to work.

Defendant also insists that the court should find that plaintiff was responsible for the breakdown of the interactive process because she chose not to attend the scheduled August 8th meeting. According to plaintiff, however, she indicated to Conant and Flora on August 6th that she would not be at the August 8th meeting and that she would be seeking a lawyer. Valente–Hook Depo. at 132:20–24. Further, although she did not attend the August 8th meeting, she continued to participate in the interactive process when, on August 8th, she delivered to Conant a letter from Dr. Reddy describing her medical condition.

Defendant insists that the breakdown was plaintiff's fault by pointing to another incident that occurred on August 8th. On that day, plaintiff attempted to retrieve her paycheck, but she was told that Flora was holding her check and that plaintiff would need to get it from her. The parties agree that plaintiff indicated to Flora that she did not want to speak with her and wished only to collect her paycheck. Valente–Hook Depo. at 148. Flora insisted, however, that plaintiff first speak with her to discuss a memorandum regarding plaintiff's need to receive an medical examination for duty fitness. During this encounter, plaintiff began yelling, which caused Conant to call security. According to defendant, plaintiff's behavior on this day demonstrates her bad faith in the interactive process.

Although the extent of plaintiff's behavior during the August meetings is disputed, it is undisputed that plaintiff did become emotional and yelled at Conant and Flora during these meetings. The question, then, necessarily becomes whether plaintiff's behavior discharged defendant's obligation to continue to engage in the interactive process in good faith. The court cannot find, for purposes of this motion, that plaintiff's behavior released defendant's obligation to engage in the interactive process. Plaintiff's behavior must be viewed in light of her disability and the circumstances surrounding her actions. First, both Conant and Flora understood that plaintiff's emotional state was delicate due to her medical condition. Conant attributed plaintiff's crying and emotional behavior at the August 6th meeting to her "difficult illness." Conant Depo. at 54:1–7. Flora "believe[d] that she [was] feeling some frustration with her current medical condition and that [was] clouding her understanding of [defendant's] position." Exh. 6. Despite their awareness of plaintiff's condition, Flora and Conant rejected plaintiff's concerns during the August 6th meeting and insisted that she must work full-time or face removal from payroll. Further, Dr. Reddy's letter, delivered to defendant on August 8th states that plaintiff was "quite down in her emotional status" "due to her fatigue . . . [and] the stress of her nursing position being ques-

tioned," which placed an "inappropriate stress level which triggers her depression." Def's Exh. G. Therefore, a trier of fact could find that plaintiff did not act in bad faith, but that her behavior was a result or component of her disability.

A trier of fact could also find that it was defendant that acted in bad faith when Flora held her check and insisted on speaking with plaintiff, despite the fact that Flora knew that plaintiff was in a delicate emotional and physical state, and had indicated she did not want to speak with Flora. Conant Depo. at 55:4–6.

Plaintiff asserts that there are further material facts in dispute upon which a jury could find that defendant failed to engage in the interactive process in good faith. For the reasons explained below, I agree with plaintiff's contention.

By August 8, 2003, defendant was in possession of plaintiff's physician's latest evaluation of her medical condition. In that letter, Dr. Reddy explains that, because plaintiff "must have radiation treatment for 6 weeks, everyday," starting the first week of September, she would be placed on full-time disability status. Def's Exh. G. Therefore, defendant understood that plaintiff could not return to work for six weeks during her breast cancer treatment. In response, Guenther wrote on August 21, 2003, that "[g]iven that she is medically disabled at this time and unable to return to work, her leave is deemed to have expired. This means that she will be suspended on our payroll" and "she is no longer eligible to participate in the employer sponsored health insurance plan." Def's Exh. H. Although defendant had a personal leave policy which would have allowed plaintiff to maintain her medical benefits, Guenther testified that the reasons for rejecting a personal leave was because plaintiff "refus[ed] to participate in the August 8th meeting," Def's SUF at 53, and her "yet unresolved" conduct on August 6th, Guenther Depo. at 99–101:6. Based on this evidence, a jury could find that Guenther's reasons for denying personal leave were in bad faith. Accordingly, defendant's motion must be denied.

### 3. *November, 2003*

 Similarly, the court determines that defendant failed to engage in the interactive process when plaintiff requested further accommodations in November 23, 2003.

The Ninth Circuit has explained that an "employer fails to engage in the interactive process as a matter of law where it rejects the employee's proposed accommodations by letter and offers no practical alternatives." *Barnett,* 228 F.3d at 1116–17. Here, as noted, Guenther flatly denied her transfer to Loyalton Hospital as well as other requests even before obtaining a medical evaluation, exploring other possible accommodations, or initiating further discussions regarding other alternatives. Thus, as in *Barnett,* defendant "denied [plaintiff's] request without suggesting any alternative solutions, or exploring ... the possibility of other accommodations."

Similarly, providing an accommodation which defendant knew that, by itself, had failed in the past, may have also been a violation of its duty to engage in the interactive process in good faith. *Humphrey,* 239 F.3d at 1138–1139 (Employer's legal obligation to accommodate is a "continuing obligation" that is triggered "where the employer is aware that the initial accommodation is failing and further accommodation is needed.").

### C. RETALIATION

Plaintiff also alleges that defendant unlawfully retaliated against her. To survive a motion for summary judgment, plaintiff must first show (1) involvement in a protected activity, (2) an adverse employment

action and (3) a causal link between the two. *McAlindin v. County of San Diego,* 192 F.3d 1226, 1238 (9th Cir.1999). "Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." Only then does the case proceed beyond the summary judgment stage. *Id.*[5]

Plaintiff alleges that defendant retaliated against her by denying reasonable accommodations, threatening to discipline her, and constructively discharging her in violation of the ADA and FEHA. Defendant does not dispute that plaintiff engaged in protected activity when she requested accommodations and complained about defendant failing to meet its legal obligations; rather, it argues that plaintiff did not suffer an adverse employment action.

██ Plaintiff asserts that she suffered an adverse employment action because the terms and conditions of her employment were negatively affected when defendant denied her a personal leave of absence or any other effective accommodation. She also contends that she suffered an adverse action when she was allegedly constructively discharged from her job. Given the temporal relationship of the events in dispute, I cannot say that a jury could not find on plaintiff's behalf.

██ Plaintiff also avers that defendant retaliated against her in violation of public policy because she complained about the "care, services, and conditions at EPDH." Plaintiff does not address these allegations in her opposition to defendant's motion for summary judgment. Because there is no apparent link between the complaints plaintiff made regarding plaintiff's hospital beds and any actions taken against her, defendant is granted summary judgment as to her retaliation causes of action.

## D. DISCRIMINATION BY WRONGFUL TERMINATION IN VIOLATION OF THE FEHA

██ Plaintiff also contends that she was constructively discharged in violation of FEHA.[6] *See Gantt v. Sentry Ins.,* 1 Cal.4th 1083, 1095, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992). In order to prevail on her wrongful termination claim, plaintiff must show that (1) EPHC unlawfully discriminated against her on account of her disability and that (2) she was forced to resign as a result thereof. *Perez v. Proctor and Gamble Mfg. Co.,* 161 F.Supp.2d 1110, 1124 (E.D.Cal.2001). As explained above, triable issues of material fact exist as to the first prong. Therefore, the question the court must examine is whether plaintiff was constructively discharged or whether she voluntarily resigned in December of 2003.

"[C]onstructive discharge occurs when, looking at the totality of the circumstances, a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Thomas v. Douglas,* 877 F.2d 1428, 1434 (9th Cir.1989) (internal quotations and citations omitted). "The determination of whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a question of fact." *Id.*

---

**5.** FEHA claims are analyzed under the same burden-shifting structure.

**6.** Defendant contends that plaintiff's discrimination claims are one and the same as her failure to accommodate claims. Plaintiff's complaint, however, is broad enough to be construed to include FEHA discrimination claims based on unlawful termination.

Plaintiff contends that she was forced to resign in December of 2003 due to EPHC's failure to offer her a reasonable accommodation and to engage in the interactive process. According to her, given defendant's continual refusal to explore reasonable accommodations and to participate in the interactive process, plaintiff concluded that EPHC was not going to accommodate her disability to allow her to work, and that she had no choice but to resign. Because a reasonable juror could conclude that plaintiff's belief was reasonable, there are triable issues of fact that preclude summary judgment in defendant's favor.

### E. CAL. HEALTH & SAFETY CODE SECTION 1278.5 (WHISTLEBLOWING)

The plaintiff also brings a discrimination and retaliation claim pursuant to section 1278.5 of the California Health and Safety Code. Compl. at ¶ 68–70.

Section 1278.5 states that "[n]o health facility shall discriminate or retaliate in any manner against any ... employee of the health facility because that ... employee ... has presented a grievance or complaint ... relating to the care, services, or conditions of that facility." Cal. Health & Safety Code § 1278.5(b)(1).

According to plaintiff, in or about October 2002, she complained about the care and condition of EPHC when she voiced her concerns regarding the "absence of bed alarms for patients." Compl. at ¶ 8. As a result of this complaint, the defendant allegedly retaliated and discriminated against her by refusing to accommodate her disability in the Spring of 2003. *Id.* at ¶ 70.

The defendant maintains that the record cannot support the plaintiff's claim because it is undisputed the plaintiff never reported her concerns to either Cathy Conant, the director of Human Resources, or to Charles Guenther, EPHC's CEO. Def.'s SUF at ¶ 81–82. Without knowledge of the plaintiff's complaints, the defendant could not retaliate against the protected whistleblowing activity. Plaintiff does not challenge defendant's contentions, but instead remains silent as to this cause of action. Accordingly, plaintiff has not demonstrated the existence of a factual dispute for this claim, and the court must grant summary judgment for the defendant.

### F. HARASSMENT

Lastly, I address plaintiff's claim that the defendant unlawfully harassed her because of her physical disability and medical condition, in violation of the FEHA. Compl. at ¶ 46–49; Pl.'s Br. in Oppo. to the Mot. for Summ. J. at 25. Specifically, the plaintiff alleges the defendant violated Cal. Gov't Code § 12940(j)(1), which provides, in relevant part, that it is unlawful "[f]or an employer ... because of ... physical disability, mental disability, medical condition ... to harass an employee ...." Cal. Gov't Code § 12940(j)(1).

Under FEHA, harassment is actionable if "the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and [the plaintiff] was actually offended." *Aguilar v. Avis Rent A Car System, Inc.,* 21 Cal.4th 121, 87 Cal.Rptr.2d 132, 139, 980 P.2d 846 (1999) (plurality) (citing *Fisher v. San Pedro Peninsula Hosp.,* 214 Cal.App.3d 590, 262 Cal.Rptr. 842 (1989)). Unlike other forms of discrimination, harassment or "hostile work environment" claims concern actions "outside the scope of job duties which are not of a type necessary to business and personnel management." *Reno v. Baird,* 18 Cal.4th 640, 76 Cal.Rptr.2d 499, 503, 957 P.2d 1333 (1998). Personnel management actions

commonly necessary to carry out the duties of business and personnel management, and thus outside the purview of harassment, include " 'hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions ...,' " and decisions regarding meetings. *Reno,* 76 Cal.Rptr.2d at 502, 957 P.2d 1333 (quoting *Janken v. GM Hughes Electronics,* 46 Cal.App.4th 55, 65, 53 Cal.Rptr.2d 741 (Cal.Ct.App.1996)).

 The plaintiff points to several events over the course of her employment with defendant to support her harassment claim. She first alleges that Cathy Conant, Maxine Flora, and Charles Guenther told her that she would be fired if she could not return to work due to her medical condition. Pl.'s Br. at 25–26. Second, EPHC unlawfully forced the plaintiff to return to work under duress and caused her health to deteriorate. *Id.* Third, plaintiff was humiliated and intimidated when, in front of her colleagues, Flora refused to release her paycheck unless they discussed a fitness-for-duty test. *Id.* Fourth, Guenther sent a letter on December 31, 2003, stating that plaintiff was a "dangerous" nurse, absent any investigation into that allegation. *Id.* Finally, EPHC forced the plaintiff to resign or risk further harm to her health. *Id.*

Plaintiff's cited evidence falls short of that required to make a prima facie case of harassment, since the incidents she complains of fall within the scope of job duties of a type necessary to business and personnel management. Although, as explained above, defendant may have violated disability laws when it refused to provide accommodations unless she returned to work, for purposes of a harassment claim, those actions squarely fit within the scope of personnel management decisions regarding hiring and firing of employees. Also, the decision to require plaintiff to return to work is inherently a decision concerning personnel management. Making personnel decisions of this kind is fundamentally different from the type of conduct that constitutes harassment. *See Reno,* 76 Cal.Rptr.2d at 502, 957 P.2d 1333 ("Harassment claims are based on a type of conduct that is avoidable and unnecessary for job performance."). The incident concerning Flora's withholding of plaintiff's paycheck also fails to qualify as harassment. Flora, as Chief Nursing Officer, acted in the supervisory capacity when she sought to discuss the plaintiff's employment situation. Plaintiff nowhere alleges that Flora made any comment outside the scope of work duties.

Additionally, the plaintiff asserts that EPHC's December 31, 2003 letter also demonstrates harassment. In that letter, Charles Guenther reiterated his refusal to assign the plaintiff to Loyalton Hospital, Exh. 13, justifying his decision in part based on plaintiff's former co-workers' opinion that plaintiff was a "dangerous" nurse. *Id.* Regardless of Guenther's questionable tact and professional judgment, his statements in the letter merely provided a reason for his decision not to assign her another work site.

 It is well established that the FEHA does not allow badgering of employees by employers, even within the sphere of personnel management actions. However, the law cannot be stretched to cover more than the legislature intended, which in this case is limited to protecting employees from harassment arising from conduct beyond job duties which are not a type necessary for business and personnel

management. *Reno,* 76 Cal.Rptr.2d at 502, 957 P.2d 1333. The actions complained of by plaintiff do not fall outside of that scope, accordingly, defendant's motion for summary judgement will be granted as to this cause of action.

## IV.

## CONCLUSION

Defendant's motion for summary judgment IS GRANTED in part and DENIED in part as follows:

1. DENIED as to failure to accommodate causes of actions, except that the court grants summary adjudication as to the failure to accommodate during August of 2003;

2. DENIED as to the failure to engage in the interactive process claims;

3. GRANTED in part and DENIED part as to the unlawful retaliation claims;

4. DENIED as to the FEHA discrimination claim;

5. GRANTED as to the Cal. Health & Safety Code § 1278.5 claim; and

6. GRANTED as to the FEHA Harassment claim.

IT IS SO ORDERED.